# Wickel, Appellant, *v.* Mertz.

*Judgment—Opening judgment after term—Fraud—Practice—New trial.*

1. A judgment entered adversely on a verdict will be opened after the expiration of the term at which it was entered, where it appears that the verdict was produced largely by the fraudulent testimony of the plaintiff at the trial.

2. In such a case the court will permit the defendant to file reasons for a new trial nunc pro tunc as of a date anterior to the judgment entered on the verdict, and then make absolute a rule for a new trial.

Argued Nov. 15, 1911. Appeal, No. 206, Oct. T., 1911, by plaintiff, from order of C. P. Berks Co., Feb. T., 1909, No. 22, making absolute rule for new trial nunc pro tunc in case of Henry L. Wickel v. G. Frederick Mertz. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Rule for a new trial nunc pro tunc.

WAGNER, J., filed the following opinion:

The trial of this case began on January 19, 1910, and resulted on January 22 in a verdict for the plaintiff for $823.33. On January 25, 1910, the defendant filed a motion for judgment n. o. v. and on the following day the plaintiff filed reasons for a new trial. The plaintiff's reasons were, on September 6, 1910, withdrawn. On September 3, 1910, the defendant made a motion for leave to file reasons for a new trial nunc pro tunc, and upon the same day a rule therefor was granted.

This petition for leave to file reasons gave as the ground thereof, first, that the plaintiff, at time of trial, had testified falsely concerning a matter material to the determination of the issue and that knowledge thereof had come to the defendant since the trial. The matter thus complained of was that the plaintiff had testified that an injury which

he had received to his arm something like the one made the basis of this suit, had occurred thirty years ago, whereas, since the trial, it had been ascertained that the accident had occurred on March 31, 1908.

The other reason was that from a recent examination of the plaintiff's arm by a reputable surgeon the huge swelling that was exhibited to the jury at the time of the trial had wholly disappeared; that the said plaintiff's arm had recovered its normal size and condition, thus showing that the jury was influenced in giving its verdict by statements that were not in accordance with the real facts of the case and by the opinions of experts which have not been borne out by subsequent developments. Depositions in support of and against this rule were taken and the case then placed on the argument list for the regular argument term of April 3, 1911. When the case was called the defendant failed to furnish the judges a paper-book, whereupon the rules for judgment n. o. v. and for leave to file reasons for a new trial nunc pro tunc were discharged for noncompliance by the defendant with Rule IX, sec. 7, of Rules of Court, which rule is:

"The party entitled to begin and conclude shall furnish to each of the Judges a paper-book, printed, or written upon type-writer in a legible hand upon one side of the paper, properly signed and endorsed, and made up as follows:

"(a) Upon a rule for a new trial, in arrest of judgment or to take off a non-suit, the paper-book shall contain (1) the names of all the parties as they stand upon the record, and the form of action; (2) a concise history of the case showing the matters needful in order to a ready apprehension of the question to be argued; (3) a copy of the reasons filed in support of the application; and (4) a brief of the argument."

On April 8, 1911, the verdict fee was paid by the plaintiff to the sheriff of Berks county and on the same day judgment was entered on the verdict for the plaintiff and against the defendant for $823.33, together with interest

from January 22, 1910. On April 10, 1911, the defendant, through one of his counsel, H. D. Green, presented his petition to the court praying it to vacate the order of April 3, 1911, discharging the rule and to reinstate the rule and place it in the same position it was previous to its discharge on April 3. This was granted. This petition made the reasons contained in the petition of September 3, 1910, asking permission to file reasons for a new trial nunc pro tunc the basis of this new petition, together with the further reason that events subsequent to the trial show that plaintiff was not suffering from elephantiasis but from a disorder self-inflicted by placing tight rubber bands upon the left arm.

The first question therefore to be considered in this case is,—Did the court have the authority to make this order of April 10, 1911, reinstating the defendant's rule to show cause why reasons for a new trial should not be allowed to be filed nunc pro tunc? The March term of court commenced on March 13, 1911, and ended on April 9, 1911. The April term of court began on April 10 and ended on May 8. The plaintiff claims that the court had no authority to make the above order, for the reason that the term in which judgment had been entered, that is, the March term, had expired. We recognize that a judgment entered adversely after hearing or trial cannot be disturbed after the term in which it is entered in cases where there is no mistake or fraud connected with the entry thereof. This is decided in King v. Brooks, 72 Pa. 363; Penna. Stave Co.'s App., 225 Pa. 178; Hill v. Egan, 2 Pa. Superior Ct. 596; Hill v. Harder, 3 Pa. Superior Ct. 473; Abeles v. Powell, 6 Pa. Superior Ct. 123; O'Donnell v. Flanigan, 9 Pa. Superior Ct. 136; Dean v. Munhall, 11 Pa. Superior Ct. 69.

The rule, however, laid down in these cases, as we understand them, does not forbid the opening of the judgment after the term in extraordinary cases upon the allegation of fraud. In the case of O'Donnell v. Flanigan, 9 Pa. Superior Ct. 136, the Superior Court, on page 138, say:

"The right of the common pleas to grant a new trial after the term, exists only in extraordinary cases, such as fraud, etc." The right to open a judgment upon an allegation of fraud is recognized in Dean v. Munhall, 11 Pa. Superior Ct. 69, where the court on page 73 say: "There was no equitable jurisdiction in the court to make it, in the absence of any allegation of fraud practiced in procuring it, and the case of Fisher v. Railway Co., 185 Pa. 602, is not therefore in point." Also, in the case of Hambleton v. Yocum, 108 Pa. 304, the Supreme Court on page 309 say: "It was also said, by ROGERS, J., in the case of Kalbach v. Fisher, 1 Rawle, 323, that the power of the common pleas to open its judgments is most ample, and that policy requires its liberal use, otherwise manifest injustice would result from the variety of shapes which fraud is wont to assume in the complication of human transactions. The language in the cases above cited is very broad and all-embracing, and to its fullest extent can apply only to judgments taken on confession or in default, and not to such as result from trial and verdict, for ordinarily such judgments can only be set aside or opened within the term to which they were rendered. The case in hand, however, involving, as it does, the charge of fraud in the procurement of the verdict on which the judgment was rendered, allows of the application of the doctrine stated, and so permits us to adopt the language of the authorities quoted." Also, in Fisher v. Railway Co., 185 Pa. 602, Mr. Justice MITCHELL, on page 604, says: "There can be no question that the rule that fraud vitiates everything into which it enters applies to verdicts and judgments, and the equitable powers of the courts on that subject may be administered summarily upon rule. But the jurisdiction as already said is exceptional, and the facts upon which it is based should appear of record." See also Gazzam v. Reading, 202 Pa. 231; King v. Brooks, 72 Pa. 363–365.

Under these last authorities the court considers that it did not commit error in its order of April 10, 1911, vacating

the order of April 3, 1911, and reinstating the rule for leave to file reasons for a new trial nunc pro tunc. The allegation in the petition of April 10, 1911, is that fraud was committed by the plaintiff by testifying that the injury for which damages were awarded was the result of the accident of November 16, 1908, whereas, it was self-inflicted and brought about by the plaintiff placing tight rubber bands over his arm, which stopped the flow in the lymphatic vessels. It also assigned as reasons the one contained in the former petition of September 3, 1910, which have already been noted.

For the purpose of arriving at a proper determination of this case, I have made a very careful examination of the testimony submitted at the time of the trial and of all the depositions that were taken with reference to these two allegations of fraud. The plaintiff claimed that he had received an accident to his arm on November 16, 1910, by being run over by defendant's automobile, and that as a result a disease had developed which the doctors for both parties testified was elephantiasis and could be produced by a stoppage of the flow in the lymphatic vessels. The whole case was, as is testified by the plaintiff's own physician, Dr. Wilson H. Rothermel, "a strange case." He also testified that "the arm seemed to get better until they took the splints off, and about two or three days after that he came around again and there was considerable swelling there." When questioned whether he ever had a physician plaintiff answered, "I did have for an injury, something like that." In answer to the question, "When did you have an injury," he answered, "I had one about thirty years ago." He further stated that this occurred at Cleaver's Horse Bazaar, and when further questioned whether it was an injury at Fourth and Penn streets, he answered, "No, that was back at the bazaar, there they were selling horses." When questioned as to whether he still had a scar on his arm, he answered, "That is a scar I got about twenty years ago." The plaintiff, as part of his case, offered in evidence shadowgraphs of his injured

left arm taken in May, 1909, and during the week before the trial. These shadowgraphs, according to Dr. C. G. Loose, show an induration, that is, a hardening or thickening. This induration was noticed by him on the outer side of the left arm immediately after the accident when he and Dr. Kauffman, at the instance of the defendant, examined the plaintiff. In this Dr. Loose was corroborated by Dr. Kauffman. The plaintiff had also testified that such a mark was on his left arm.

Turning now to the depositions taken by the defendant on September 23, 1910, I find, according to the testimony of Dr. F. E. Howell and Dr. Wilson H. Rothermel, that the injury to the arm, which the plaintiff at the trial testified had occurred some twenty or thirty years prior, occurred on March 31, 1908. Again referring to the plaintiff's new depositions taken on January 31, 1911, I find that the plaintiff admits that this injury really happened on March 31, 1908, but he now says, in answer to the question, "Was your arm not hurt?" "No, it was the shoulder, but Dr. Rothermel said I should tie up the arm to take the weight off the shoulder," and again reiterated that the arm was not hurt. Thus, whilst the plaintiff now admits the time of the injury to have been different from that testified to by him at the trial, he contradicts his former testimony that the injury to the arm was somewhat like the injury that he had received on November 16, 1908.

When we consider the entire testimony in this case, the testimony given by the physicians who examined him immediately after the injury—

Testimony of Dr. Loose: "Q. Did you find anything abnormal about the arm? A. Yes, sir. Q. What was it? A. There was an induration on the outer side of the arm from here up above the wrist. Q. Which arm? A. The left arm. Q. What do you mean by an induration? A. An induration is a hardening, a thickening; it was slight but it was there. Q. Have you looked at the shadowgraphs that have been offered by the other side? A. Yes, sir. Q. Can you point out that induration? A. Yes, sir.

Q. Be kind enough to do it?, A. The bone here is plainly visible. This is the inner side here and this is the outer side of the arm. Right there (indicating), it is a little thicker than it ought to be—it is thicker than it ought to be. Q. Did that condition, that thickening that you described have anything to do at all with the accident that day? A. No, sir. Q. State whether or not that was a condition that existed for some time prior to November 16, 1908? A. In my opinion it was."

\*     \*     \*     \*     \*     \*     \*     \*

"Q. You found nothing wrong the second day? A. It was all right, yes, sir. Q. Everything in first class condition? A. Except a little induration. Q. A little hardening at the wrist? A. Yes, sir. Q. Which you say probably antedated the happening of this accident. Is that correct? A. Yes, sir. Q. How long before—two days or three days? A. No, sir. In my opinion, some time before, months probably."

Testimony of Dr. Kauffman: "Q. What else did you do? A. Well, we examined the arm and we found that the arm had some creases from the bandages which seemed to have been rather tight, but we could find no injury, no fracture or any injury existing. There was a small nodule or induration about one-third distance up the arm, up the forearm of the arm. Q. Did that induration have any connection with the alleged injury that he had received the day before? A. I don't think so. Q. What was the nature of that induration? A. Simply a small thickened area; it didn't seem to be attached to anything; it was simply a hardening, a thickening; it seemed to be in the tissues of the arm."

\*     \*     \*     \*     \*     \*     \*     \*

"Q. Did you after that examine his arm? A. Yes, sir, we put the splint back on the arm. Q. After that did you examine his arm? A. Yes, sir, I examined it since then. Q. When? A. About a week ago. Q. Where? A. Dr. Loose's office. Q. In the presence of the parties that

Dr. Loose mentioned? A. Yes, sir. Q. What did you ascertain the condition then? A. We found his arm very much swollen, an œdematous condition, marked induration, some excoriation of the skin showing all signs of lymphangectiasis. A. A preliminary state of what? A. Elephantiasis."

*   *   *   *   *   *   *   *

"Q. From your examination of Mr. Wickel made on November 18, 1908, was there any such injury which could have caused this condition of the arm? A. I don't think so. Q. Did you find any injury there at that time? A. I did not find any. Q. On the other hand, you found an injury in his arm which you say was unconnected entirely with this alleged injury? A. Yes, sir."

Testimony of Dr. Gerhard: "Q. What is the matter with Mr. Wickel's arm? A. There is unquestionably a stasis of the lymph stream. Q. That is, a stopping up? A. Yes, sir."

*   *   *   *   *   *   *   *

"Q. Assuming that Mr. Wickel was examined on November 18, 1908, by a physician, on the day on which he alleges he received an injury to his arm and was again examined by a physician on November 18, 1908, and if this physician found no evidence of any injury at all, is or is not the condition of his arm the result of any injury received on that day? A. I think not. Q. Assuming again that in the examination induration of the arm was found as described by Dr. Loose and Dr. Kauffman, as described in your hearing, would or would not that be an induration antecedent to the trouble from which he is now suffering? A. It may if it were of such a nature as to close the lymph vessels, cause a choking, a stasis of the lymph stream. Q. By stasis you mean a stopping up? A. Stopping, damming up."

—the alleged results produced by the injury and the character thereof, and that it was testified that the huge swelling of the arm, or the disease that the doctors said was

elephantiasis, could be produced by a violence to the arm, which would cause a stoppage of the flow of the lymphatic vessels, we see how important and material the fact was whether this injury to the arm had occurred on March 31, 1908, seven and one-half months prior to the accident of November 16, 1908, or whether it had occurred, as sworn to by the plaintiff, twenty or thirty years before.

The case as presented to the jury was that the accident of March 31, 1908, had occurred twenty or thirty years ago, and that no inconvenience had since resulted therefrom. From this they naturally would find that the present condition of the arm was the result of the accident of November 16, 1908, and not of the similar injury sustained, as testified to, twenty or thirty years before. Had, however, the plaintiff answered truly to the time of this injury, then, this prior injury would have presented itself to the jury in quite a different light.

The plaintiff is an intelligent man. For a number of years he was an alderman of the city of Reading and as such alderman was obliged to weigh the evidence of the various cases that were heard before him. There is no question in my mind but that the plaintiff realized the importance to his case of the time of the accident of March 31, 1908, and that it was on account of this realization, that he swore that it had occurred twenty or thirty years before. Considering the entire testimony, together with what has developed since the time of the trial, I cannot come to any other conclusion than that this verdict was produced largely by the false testimony of the plaintiff as to the time of the occurrence of the accident which is now practically admitted occurred on March 31, 1908. The verdict, therefore, upon which this judgment was obtained is unquestionably tainted with this false testimony of the plaintiff, and the plaintiff in swearing as he did at the time of the trial committed a fraud upon the jury in giving to them testimony that he must have known to be false. In the case of Struthers v. Wagner, 6 Phila. 262, it is held: "Where a defendant can produce

after-discovered evidence tending to prove that any material part of the plaintiff's testimony was false, he is entitled to have his case submitted to another jury." Also, in Corrigan et al. v. W. B. & W. V. T. Co., 14 Luzerne Leg. Reg. 115, it is held, "A new trial should be granted where a witness, testifying to material facts in the issue, is afterward convicted of perjury as to said testimony." It seems therefore that upon this allegation the petition of the defendant to file reasons for a new trial nunc pro tunc should be allowed and also that a new trial should be granted.

The other allegation by the defendant is that the results of this injury, to wit, the huge swelling of the arm, was self-inflicted by the plaintiff, by placing tight rubber bands around the arm, thus causing a stoppage of the flow in the lymphatic vessels. Dr. Gerhard, the prison physician, in the depositions, testified that he discovered these bands upon the plaintiff upon going to the Berks county jail, where the plaintiff was confined. Taking his depositions into consideration and considering them in the light of all the testimony that was given at the trial, and what has developed since, a sufficient question of fraud arises which, in furtherance of justice, I consider should be passed upon by a jury. I do not consider that the order of April 10 reinstated the rule for judgment n. o. v. Neither there do I consider, upon a careful examination of the testimony, that that rule should have been made absolute. There was sufficient in the case, as shown by the evidence, to have it passed upon by the jury.

The rule to permit the defendant to file his reasons for a new trial nunc pro tunc is made absolute. As the discussion of this rule has also necessarily involved the merits of the granting of a new trial, the rule for a new trial is granted and at the same time made absolute.

*Error assigned* was the order of the court.

*W. B. Bechtel*, with him *D. E. Schroeder*, for appellant, cited: Hill v. Egan, 2 Pa. Superior Ct. 596; Mathers v.

Patterson, 33 Pa. 485; Syracuse Pit Hole Oil Co. v. Carothers, 63 Pa. 379; Van Vliet v. Conrad, 95 Pa. 494; Cronrath v. Border, 27 Pa. Superior Ct. 15; Hill v. Harder, 3 Pa. Superior Ct. 473; Milleisen v. Senseman, 4 Pa. Superior Ct.. 455; Drexel's App., 6 Pa. 272.

*C. H. Ruhl,* with him *Green & Green,* for appellee, cited: Fisher v. Ry. Co., 185 Pa. 602; Zeigler's Petition, 207 Pa. 131; Hambleton v. Yocum, 108 Pa. 304; Gazzam v. Reading, 202 Pa. 231.

OPINION BY HEAD, J., March 1, 1912:

There can be no doubt of the existence of the general rule that in ordinary cases and under usual conditions the court may not interfere with a judgment entered adversely after the expiration of the term at which it was entered. A judgment of a tribunal, legally constituted to try and determine litigated questions, when obtained by the proper use of the procedure prescribed by the law, voices the accepted effort of human wisdom to reach the end of controversy. This being so and a judgment being the end of the law, there necessarily must be a time after which it cannot be disturbed even by the court entering it. Hence the rule.

But when it is shown that what is a judgment in form was in fact secured by the fraudulent and immoral if not illegal acts of one of the parties, our whole system of jurisprudence would be a failure if the courts were not armed with the extraordinary powers necessary to deal with such unusual conditions. And so it has long been held that where a court undertakes to expunge from its own records a judgment shown to have been obtained by fraud, it is not bound by the limitations of the general rule referred to.

The learned judge below, in the careful opinion filed by him in support of the conclusion he reached, cites and reviews the numerous decisions on the one hand declaring the general rule and on the other asserting the extraor-

dinary powers of the courts in cases where judgments or decrees have been obtained by fraudulent means. We can add nothing of value to his opinion in these respects.

The facts necessary to ground the exceptional jurisdiction of the court are fully set forth in the petition filed and thus brought upon the record in the manner approved by the Supreme Court, speaking by Mr. Justice MITCHELL, in Fisher v. Railway Co., 185 Pa. 602. The facts thus averred and found by the learned judge below are strongly supported by the testimony of the witnesses whose depositions were taken. The proceeding therefore was regular. The action taken at the conclusion thereof was within the well-recognized powers of the courts in such cases, and as we view it was fully warranted by the facts found.

The order or decree permitting the defendant to file reasons for a new trial nunc pro tunc as of a date anterior to the judgment entered on the verdict and then making absolute the rule for such new trial is affirmed and the present appeal is dismissed at the costs of the appellant.